IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| MARY HEATHER MCAFEE, *on behalf of herself and all similarly situated individuals*,<br><br>Plaintiff,<br><br>v.<br><br>MERIDIANLINK, INC.,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:   Civil Action No. 3:23-cv-439<br>:<br>:<br>:<br>:<br>: |

**CLASS ACTION COMPLAINT**

Mary Heather McAfee, by Counsel, brings this Class Action Complaint against MeridianLink, Inc., on behalf of herself and the class set forth below:

**INTRODUCTION**

1. This is a class action for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, against a MeridianLink, a reseller consumer reporting agency, that falsely reports living consumers as deceased.

2. MeridianLink is a consumer reporting agency that assembles consumer reports for sales to other consumer reporting agencies. Specifically, MeridianLink assembles tri-merge reports, which are used in mortgage lending. MeridianLink obtains a consumer's credit reports from each of the three major credit reporting agencies (Equifax, Experian, and Trans Union), assembles that information into a single report and then, for a monetary fee, sends that report to yet another consumer reporting agency (in this case, CIC Mortgage Credit, Inc. or "CIC"), who passes the report on to a mortgage lender, who uses it to determine whether to approve or deny a consumer's mortgage application.

1

3. In compiling these tri-merge reports, MeridianLink does not have any procedures or safeguards in place to make sure that the data it is reporting about consumers is accurate. Instead, it reproduces the information that it receives from each of the three major CRAs, even if that information is patently inaccurate.

4. In Ms. McAfee's case, MeridianLink received data from Equifax inaccurately indicating that Ms. McAfee was deceased.

5. MeridianLink forwarded this inaccurate information to CIC, who sent it to Ms. McAfee's mortgage lender, even though MeridianLink knew, or should have known, that Ms. McAfee was not deceased. For example, neither Experian nor Trans Union reported that she was deceased. Ms. McAfee had several tradelines showing that she was still making monthly payments on her open accounts. And Ms. McAfee's social security number, which MeridianLink had from CIC, was not listed on the Social Security Administration's death master index.

6. MeridianLink provided this information CIC without any safeguards in place to prevent the inaccurate reporting, it caused Ms. McAfee's credit score to be listed as "zero," making it impossible for her to qualify for a mortgage.

7. MeridianLink's reporting about Ms. McAfee results from its standardized procedures and, upon information and belief, has affected hundreds or thousands of other consumers over the past several years.

8. MeridianLink continues this inaccurate reporting despite extensive notice of this pervasive inaccuracy in its reports. MeridianLink's inaccurate deceased reporting has devastating consequences for individuals who are misreported as dead because, again, credit bureaus will not issue credit scores for deceased consumers—meaning that someone being falsely reported as deceased cannot obtain credit.

9.  MeridianLink's complete lack of procedures to prevent this serious inaccuracy violates the FCRA.

10. Indeed, when enacting the FCRA, Congress found that consumer reporting agencies "have assumed a vital role in assembling and evaluating . . . information on consumers." 15 U.S.C. § 1681(a)(3). Thus, Congress saw a need to ensure that consumer reporting agencies "exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." *Id.* § 1681(a)(4). To accomplish Congress' goal, the FCRA contains several requirements to protect consumers, including § 1681e(b), which is one of the statute's cornerstone provisions.

11. Section 1681e(b) requires that consumer reporting agencies follow reasonable procedures to assure maximum possible accuracy of the information on the individuals about whom they report. 15 U.S.C. § 1681e(b). This section imposes a high standard on consumer reporting agencies. *See, e.g., Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011) (breaking down the requirements of § 1681e(b) and explaining that "'assure' means 'to make sure or certain: put beyond all doubt,'" "'[m]aximum' means the 'greatest in quantity or highest degree attainable[,]' and 'possible' means something 'falling within the bounds of what may be done, occur or be conceived'" (quoting *Webster's Third New International Dictionary* 133, 1396, 1771 (1993))).

12. Like a traditional consumer reporting agency, the FCRA mandates that resellers, like MeridianLink, use reasonable procedures to assure maximum possible accuracy whenever they publish a consumer report. *See* 15 U.S.C. § 1681a(u) (defining a reseller as a consumer reporting agency when it assembles and merges information from the database of another

consumer reporting agency and does not maintain a database of its own from which new reports are produced).

13. MeridianLink violated these requirements when it automatically included the facially inaccurate deceased notations in Ms. McAfee's and the putative class members' tri-merge reports without any meaningful procedures to prevent the inaccuracies.

14. As a result, Ms. McAfee seeks statutory and punitive damages, costs and attorneys' fees for Plaintiff and the putative class members for MeridianLink's willful violations of the FCRA, 15 U.S.C. § 1681e(b).

## THE PARTIES

15. Ms. McAfee is a natural person who lives in Henrico County, Virginia, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

16. Defendant MeridianLink, Inc. is a foreign limited liability company with its headquarters and its principal place of business in Costa Mesa, California that does business nationwide.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

18. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## BACKGROUND

### MeridianLink is a Consumer Reporting Agency

19. MeridianLink is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). MeridianLink is regularly engaged in the business of assembling, evaluating, and disseminating information about consumers to furnish consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

20. The three major consumer reporting agencies—Experian, Equifax, and Trans Union—regularly receive information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, the Social Security Administration, and others.

21. Experian, Equifax, and Trans Union collect their credit information from thousands of sources and distribute that information to their customers/subscribers.

22. Although many of their customers are creditors, Experian, Equifax, and Trans Union generate significant revenue by selling credit information to "resellers" of consumer reports, like MeridianLink and CIC.

23. "Reseller" is a defined term in the FCRA. Specifically:

> The term "reseller" means a consumer reporting agency that (1) assembles and merges information contained in the database of another consumer reporting agency or multiple consumer reporting agencies concerning any consumer for purposes of furnishing such information to any third party, to the extent of such activities; and (2) does not maintain a database of the assembled or merged information from which new consumer reports are produced.

15 U.S.C. 1681a(u).

24. Importantly, the definition of reseller makes clear that resellers are consumer reporting agencies.

25. Courts interpreting the meaning of the word "assemble" in the context of the FCRA have interpreted it broadly. *See, e.g.*, *Lewis v. Ohio Pro. Elec. Network LLC*, 190 F. Supp. 2d

1049, 1058 (S.D. Ohio 2002) ("The word assemble means "to bring or summon together in a group ... to bring together ... to put or join together ... in an orderly way.... [the FCRA] requires only that the assembler gather or group the information."); *Poore v. Sterling Testing Sys., Inc.*, 410 F. Supp. 2d 557, 567 (E.D. Ky. 2006) ("In a Staff Opinion Letter, the FTC states that it is clear from the legislative history of FCRA that Congress intended for the Act to cover a very broad range of "assembling" or "evaluating" activities. 1998 WL 34323759, FTC Staff Opinion Letter, William Haynes (June 9, 1998). As an example of the broad range of activity covered by FCRA, the FTC cites specifically to "resellers," stating that these entities are covered by FCRA even though they "may do nothing more than transmit to their customers a report obtained from another consumer reporting agency." *Id.* at n. 1."); *McGrath v. Credit Lenders Serv. Agency, Inc.*, No. CV 20-2042, 2022 WL 580566, at *6 (E.D. Pa. Feb. 25, 2022).

26. MeridianLink is a reseller because it assembles and merges data from the three major consumer reporting agencies for the purpose of furnishing that information to a third party, and because it does not maintain its own database from which new reports are produced.

27. After receiving the credit information from the credit bureaus, MeridianLink assembles and merges the credit information obtained into a 3-bureau credit report, also known as a "tri-merge" or "merged infile" credit report and sell them to its customers. While the CIC logo appears on Plaintiff's report, it was MeridianLink who obtained the information on that report from the three major consumer reporting agencies, and who assembled and merged those three data files into a single report.

28. When MeridianLink requests credit information from the credit bureaus for a particular consumer, the credit information is exchanged through an automated process, and the credit bureaus send the raw credit data to MeridianLink electronically.

29. After receiving the raw credit data from the credit bureaus and other sources for a particular consumer, MeridianLink assembles, merges, and normalizes the credit information into a tri-merge credit report.

30. MeridianLink is therefore a "reseller" as defined at 15 U.S.C. § 1681a(u), which is a type of consumer reporting agency, and it is subject to the requirements of 15 U.S.C. § 1681e(b).

### MeridianLink Generates and Assembles Tri-Merge Reports Without Reviewing Them for Inaccuracies

31. When MeridianLink generates a tri-merge report for a consumer, it requests that consumer's information from Equifax, Experian, and Trans Union, and each of these credit bureaus transmit the raw data about the consumer's credit file back to MeridianLink. MeridianLink then assembles, merges, normalizes, and summarizes that data into a tri-merge credit report. All these communications are electronic and automated.

32. MeridianLink does nothing to ensure that the credit information it receives from the credit bureaus is, in fact, accurate.

33. MeridianLink also does not try to reconcile any conflicting information that it receives from the credit bureaus. Instead, MeridianLink accepts each of the credit bureau's reporting at face value and passes that information along to its customer without altering the substance of the data or flagging any inconsistencies or potential errors.

34. For example, if one credit bureau reports that a consumer is deceased, MeridianLink accepts that reporting and includes it in the report that it sells to its customer, even though the other two credit bureaus report that the consumer is alive.

35. MeridianLink does not employ any procedures at all to ensure that this deceased notation is correct.

36. MeridianLink reports this deceased notation even when other data on the consumer's tri-merge report indicates that the consumer is alive, like a current and active credit history or a deceased notation by only one bureau.

37. MeridianLink also does not independently verify with any source that the consumer is, in fact, deceased before including the "deceased" notation on the consumer's tri-merge credit report.

38. This inaccurate deceased reporting has devastating consequences for consumers.

39. Once a "deceased" notation is included in a consumer's report, it results in a "zero" or "N/A" credit score.

40. If only one credit bureau is reporting the deceased notation, a credit score will not generate for that bureau, but MeridianLink will provide credit scores for the other two credit bureaus.

41. But MeridianLink knows that mortgage lenders require a credit score from all three credit bureaus to process a mortgage application and that missing a score from even one of the bureaus will result in an automatic credit denial.

**MeridianLink Inaccurately Reports Ms. McAfee as Deceased**

42. In October 2021, Ms. McAfee tried to purchase a home and applied for a mortgage with Capital Mortgage Group.

43. As part of application process, Capital Mortgage Group requested Ms. McAfee's tri-merge report from CIC. CIC, in turn, requested a report from MeridianLink.

44. MeridianLink requested Ms. McAfee's data from the three major credit bureaus, assembled a report, and provided that report to CIC. CIC, in turn, provided Ms. McAfee's tri-merge report to Capital Mortgage Group on or around October 12, 2021.

45. MeridianLink's report included data and credit scores from Experian and Trans Union. But MeridianLink reported to CIC, and ultimately to Capital Mortgage Group, that Ms. McAfee was deceased based on the information showing in her Equifax file.

46. CIC reported this information without taking any steps to verify it, even though it received other credit scores and information from Experian and Trans Union showing that Ms. McAfee had active accounts with recent activity.

47. Because of MeridianLink's inaccurate reporting, Ms. McAfee's mortgage application was denied.

### *MeridianLink's FCRA Violations Were Willful*

48. The Supreme Court has held that willfulness under the FCRA encompasses not only a knowing violation but also a violation committed in reckless disregard of statutory obligations. *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47 (2007).

49. Recklessness is measured by an objective standard: conduct that creates an "unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* at 68.

50. Here, MeridianLink willfully violated the FCRA because its procedures caused an unjustifiably high risk of harm that was either known or was so obvious it should have been known. MeridianLink had information available to it—including information included in the report—showing that Ms. McAfee was not deceased.

51. As the Federal Trade Commission has explained, reasonable procedures to assure maximum possibly accuracy include "establish[ing] procedures to avoid reporting information from its furnishers that appears implausible or inconsistent." FTC, *40 Years of Experience with the Fair Credit Reporting Act: An FTC Report with Summary of Interpretations* 67 (July 2011),

available at https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf.

52. A credit reporting agency "must maintain procedures to avoid reporting information with obvious logical inconsistencies, such as a credit account opened when the consumer was known to be a minor" or, as here, whether a consumer is deceased.

53. Further, the federal agency currently charged with interpreting the FCRA, the Consumer Financial Protection Bureau, recently issued an interpretation making clear that a consumer reporting agency violates its duty under § 1681e(b) when it reports people as dead who are obviously alive:

> [i]nformation about consumer accounts that is plainly inconsistent with other reported information, such that one piece of information must be inaccurate – for example, if every other tradeline is reporting ongoing payment activity, while one tradeline contains a "deceased" indicator, reasonable policies and procedures should identify the inconsistency and the consumer reporting agency should prevent the inclusion of the inaccurate information in consumer reports it generates.

CFPB Advisory Opinion on Fair Credit Reporting; Facially False Data,[1] at 9, October 20, 2022, __ Fed. Reg. __, citing *Gohman v. Equifax Info. Services, LLC*, 395 F. Supp. 2d 822, 827 (D. Minn. 2005) and *Sheffer v. Experian Info. Sols., Inc.*, No. 02-7407, 2003 WL 21710573, at *2 (E.D. Pa. July 24, 2003) (referencing the fact that only one account of approximately two dozen on a consumer's report included the "deceased" notation as one of two "inconsistencies" that "provide[d] a basis from which a jury could infer that the procedures were unreasonable").

---

[1] Available at https://files.consumerfinance.gov/f/documents/cfpb_fair-credit-reporting-facially-false-data_advisory_opinion_2022-10.pdf. Nor is this interpretation new. Rather, it is "consistent with prior [2011] Federal Trade Commission" interpretation, quoted above. *Id*. at 10 n. 27.

54. If MeridianLink had reasonable procedures in place in line with the FTC and CFPB guidelines and the FCRA's plain language, MeridianLink would not have inaccurately reported Ms. McAfee and the putative class members as deceased.

55. MeridianLink also does not conduct any independent verification with any source that a consumer is actually deceased before adding the deceased notation to a consumer's credit file.

56. For example, MeridianLink could purchase the "Death Master File" from the Social Security Administration listing all the consumers that the United States government believes to be deceased, organized by social security number. It could then cross-reference its reporting to determine whether the deceased notation that they are reporting is in fact accurate.

57. In addition, MeridianLink also ignores other conflicting information in a consumer's file—such as the opening of new accounts, payments made on currently open accounts, or the failure of other data furnishers to report the consumer as deceased—before marking a consumer as deceased.

58. MeridianLink s conduct was also willful because it knew or should have known of the inadequacy of its procedures through lawsuits in other jurisdictions against its customers and competitors. *Sheldon v. Experian Info. Sols., Inc.*, No. CIV.A. 08-5193, 2010 WL 3768362 (E.D. Pa. Sept. 28, 2010); *Aslani v. Corelogic Credco, LLC*, No. 1:13-cv-2635-CC-LTW, 2014 WL 12861199, at *1 (N.D. Ga. Aug. 18, 2014), *report and recommendation adopted,* No. 1:13-cv-2635-CC-LTW, 2014 WL 12861361 (N.D. Ga. Sept. 8, 2014); *Sheffer v. Experian Info. Sols., Inc.*, No. CIV.A. 02-7407, 2003 WL 21710573, at *2 (E.D. Pa. July 24, 2003); *Oxfurth v. Experian Info. Sols., Inc.*, 1:14-cv-123 (E.D. Va.); *Boris v. Expertian Info. Sols., Inc.*, 7:16-cv-206 (W.D. Va.); *Pang v. Credit Plus, Inc.*, 1:20-cv-122 (D. Md.).

59. Upon information and belief, MeridianLink has also been notified of the inadequacy of its procedures through disputes submitted by consumers and complaints from customers.

60. Despite these lawsuits and complaints, MeridianLink has not revamped its procedures to ensure that the credit reports that it prepares, publishes, and maintains are as accurate as possible, as required by the FCRA at 15 U.S.C. § 1681e(b).

61. Accordingly, MeridianLink's violations of the FCRA are willful and it is liable for statutory and punitive damages under 15 U.S.C. § 1681n.

### COUNT ONE: VIOLATION OF FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681e(b)
### Class Claim

62. Ms. McAfee restates each of the preceding allegations.

63. Under Fed. R. Civ. P. 23, Ms. McAfee sues individually and on behalf of the following class:

> All natural persons who were the subject: (1) of a consumer report furnished by the Defendant to a third party within the five years before the filing date of this Complaint; (2) where the report contained a status indicating that the consumer was deceased from Equifax, Experian, or Trans Union; (3) where at least one other credit bureau did not contain a deceased notation; and (4) where the consumer was not deceased at the time the report was issued.

64. **Numerosity**. Upon information and belief, Plaintiff alleges that the class is so numerous that joinder of the claims of all class members is impractical. The class members' names and addresses are identifiable through the Defendant's documents and records and they may be notified of the pendency of this action by publication or mailed notice.

65. **Existence and Predominance of Common Questions of Law and Fact**. Common questions of law and fact exist as to all putative class members. These questions predominate over

the questions affecting only individual members. These common legal and factual questions include, among other things: (a) whether Defendant blindly includes a deceased notation that it obtains from credit bureaus into its reports with no procedure to assure the accuracy or completeness of the underlying data; (b) whether this conduct violated the FCRA; and (c) whether the violation was negligent, reckless, knowing, or intentionally committed in conscious disregard of the Plaintiff's and putative class members' rights.

66. **Typicality**. Plaintiff's claims are typical of the claims of each putative class member and all claims are based on the same facts and legal theories. Plaintiff, as every putative class member, alleges a violation of the same FCRA provision, 15 U.S.C. §1681e(b). This claim challenges the Defendant's consumer reporting procedures and does not depend on any individualized facts. For purposes of class certification, Plaintiff seeks only statutory and punitive damages. Such damages are appropriate in circumstances like this one where injuries are particularized and concrete, but difficult to quantify, rendering the recovery of class statutory damages ideal and appropriate. Plaintiff is also entitled to the relief under the same causes of action as the other class members.

67. **Adequacy**. Plaintiff will fairly and adequately protect the class's interests. Plaintiff has retained counsel experienced in handling actions involving unlawful practices against consumers and class actions. Neither Plaintiff nor her counsel have any interests that might cause them not to vigorously pursue this action. Plaintiff is aware of her responsibilities to the putative class and has accepted such responsibilities.

68. Certification of the class under Rule 23(b)(3) of the Federal Rules of Civil Procedure is also appropriate in that:

    a. As alleged above, the questions of law or fact common to the class members

predominate over any questions affecting an individual member. Each of the common facts and legal questions in the case overwhelm the more modest individual issues. The statutory and punitive damages sought by each member are such that the individual prosecution would prove burdensome and expensive given the complex and extensive litigation required by Defendant's conduct. And those individual issues that do exist can be effectively streamlined and resolved in a manner that minimizes the individual complexities and differences in proof in the case.

        b.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Consumer claims generally are ideal for class treatment as they involve many, if not most, consumers who are otherwise disempowered and unable to afford and bring such claims individually. Most consumers affected by Defendant's conduct described above are likely unaware of their rights under the law or of whom they could find to represent them in federal litigation. Individual litigation of the uniform issues here would waste judicial resources. The issues at the core of this case are class wide and should be resolved at one time. One win for one consumer would set the law for every similarly situated consumer.

69.    Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in preparing the consumer reports it published and maintained about the Plaintiff and the putative class members by blindly reselling deceased notations from Experian, Equifax, and Trans Union even though it contradicted other information in the report.

70. Defendant's violation of 15 U.S.C. § 1681e(b) was willful, rendering the Defendant liable under 15 U.S.C. § 1681n. In the alternative, the Defendant was negligent, entitling the Plaintiff to recover under 15 U.S.C. § 1681o.[2]

71. In addition, the Plaintiff and each class member suffered an actual injury because of the Defendant's violation, as alleged here.

72. Plaintiff and the putative class members are entitled to recover statutory damages, punitive damages, costs, and attorney's fees from the Defendant in an amount to be determined by the Court under 15 U.S.C. § 1681n.

WHEREFORE, Plaintiff, on behalf of herself and the putative class members, moves for class certification and for statutory damages, punitive damages, attorneys' fees, and costs as pleaded above against MeridianLink for the class claim, for prejudgment and post-judgment interest at the legal rate, and any other relief the Court finds appropriate.

**PLAINTIFF DEMANDS A JURY TRIAL.**

Respectfully submitted,
**MARY HEATHER MCAFEE**

By: __/s/ Kristi C. Kelly_____
        Counsel

Kristi C. Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
Casey S. Nash, VSB #84261
J. Patrick McNichol, VSB #92699
KELLY GUZZO, PLC
3925 Chain Bridge, Suite 202
Fairfax, VA  22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email:  kkelly@kellyguzzo.com
Email:  aguzzo@kellyguzzo.com

---

[2] Plaintiff seeks statutory and punitive damages on behalf of herself and others. If class certification is denied, Plaintiff intends to seek actual damages for Defendant's violation.

Email: casey@kellyguzzo.com
Email: pat@kellyguzzo.com

Dale W. Pittman, VSB #15673
THE LAW OFFICE OF DALE W. PITTMAN, PC
The Eliza Spotswood House
112-A West Tabb Street
Petersburg, Virginia 23803
Telephone: (804) 861-6000
Facsimile: (804) 861-3368
Email: dale@pittmanlawoffice.com
*Counsel for Plaintiff*